## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GABBY KLEIN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>UBIQUITI NETWORKS, INC., ROBERT J. PERA, KEVIN RADIGAN, JOHN RITCHIE, and MARK SPRAGG,<br><br>Defendants. | **Case No.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Gabby Klein ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, for her complaint against Defendants, alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Ubiquiti Networks, Inc. ("Ubiquiti" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired Ubiquiti securities between

September 28, 2012 and September 18, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Ubiquiti develops technology platforms for high-capacity distributed Internet access, unified information technology, and next-generation consumer electronics for home and personal use. The Company does not employ a traditional sales force. Instead, it purports to "drive[] brand awareness largely through the company's user community where customers can interface directly with R&D, marketing, and support." The Company calls this user community the "Ubiquiti Community."

3.      Information newly disclosed to the market reveals that that the size of the "Ubiquiti Community" is grossly exaggerated.

4.      Founded in 2003, the Company is headquartered in New York, New York. Ubiquiti's stock trades on the NASDAQ Global Select market ("NASDAQ") under the ticker symbol "UBNT."

5.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the number of the Company's purported user community was drastically overstated; (ii) it had exaggerated its publicly reported accounts receivable; and (iii) as a result of the foregoing, Ubiquiti's publicly disseminated financial statements were materially false and misleading.

6.      On September 18, 2017, Citron Research ("Citron") issued a report entitled "Citron Exposes Ubiquiti Networks," (the "Citron Report") in which Citron detailed a series of "alarming red flags," indicating that the Company has been deceiving investors and is engaged in "corporate fraud," including, among other things, that the Company has misrepresented the size of its purported "Ubiquiti Community", as well as its levels of accounts receivable, among other things.

7.      On this news, Ubiquiti's share price fell nearly 8% to close at $50.62 on September 18, 2017.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

11.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). Ubiquiti's principal executive offices are located within this Judicial District.

12.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

3

including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

13.     Plaintiff, as set forth in the attached Certification, acquired Ubiquiti securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

14.     Defendant Ubiquiti is incorporated in Delaware, with principal executive offices located at 685 Third Avenue, 27th Floor, New York, New York 10017.  Ubiquiti's shares trade on the NASDAQ under the ticker symbol "UBNT."

15.     Defendant Robert J. Pera ("Pera") co-founded and has served at all relevant times as the Company's Chairman and Chief Executive Officer ("CEO").

16.     Defendant John Ritchie ("Ritchie") served as the Company's Chief Executive Officer ("CFO") from 2010 until his resignation on February 2013.[1]

17.     Defendant Mark Spragg ("Spragg") served as the Company's Interim Chief Accounting Officer from August 4, 2015 until May 3, 2016.

18.     Defendant Kevin Radigan ("Radigan") has served as the Company's Principal Financial and Accounting Officer since May 3, 2016.

19.     The defendants referenced above in ¶¶ 15-18 are sometimes referred to herein as the "Individual Defendants."

---

[1] The Company has had a revolving door of senior financial executives since Mr. Ritchie resigned the Company on February 28, 2013. He was replaced by Craig L. Foster as CFO. Mr. Foster resigned on April 21, 2015 and was replaced by non-defendant Hartley Nissenbaum as "interim CFO," while the Company announced that "Mr. Foster's duties as principal financial officer and principal accounting officer [would] be performed on an interim basis by Rohit Chakravarthy … who has also been appointed as the Company's Chief Accounting Officer." Chakravarthy resigned after less than four months, and Defendant Spragg was named Interim Chief Accounting Officer effective August 4, 2015. Defendant Spragg lasted less than a year; he was replaced by Defendant Radigan on May 3, 2016.

20.     The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, i.e., the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their positions within the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

21.     Ubiquiti develops technology platforms for high-capacity distributed Internet access, unified information technology, and next-generation consumer electronics for home and personal use. The Company does not employ a traditional sales force. Instead, it purports to "drive[] brand awareness largely through the company's user community where customers can interface directly with R&D, marketing, and support." The Company calls this user community the "Ubiquiti Community."

22.     The Citron Report, published on September 18, 2017, asserted that Ubiquiti's financial reports "have every indication of being completely fraudulent."

23.     Citron commented on various suspicious elements of Ubiquiti's public financial statements. For example, Citron noted that Ubiquiti had achieved various operating metrics that far outpaced its larger rivals. According to Citron, Ubiquiti had operating margins and return on equity of 33.5% and 49.2%, respectively, while its closest competitor – the far larger and better-known Cisco Systems, Inc. – only generated operating margins and return on equity of 26.5% and 49.2% respectively, with other competitors trailing Cisco.

24.     Citron also cast aspersions on Ubiquiti's network of far-flung overseas distributors, insinuating that "Ubiquiti's big markets are money-laundering havens." Plus, Citron observed that Ubiquiti's reported cash balances generate far lower interest income, as a percentage, than other tech companies' cash balances.

25.     Citron comments on repeated turnover in the executive ranks of Ubiquiti, and it alleged that an arrest warrant for a Taiwanese Ubiquiti executive, and a lawsuit alleging software piracy, (among other issues), were indicative of "an underbelly of corrupt corporate culture."

26.     In addition to innuendo, the Citron Report also documented verifiable fraudulent statements concerning the reporting of accounts receivable, and the size of Ubiquiti's reported user base a/k/a the "Ubiquiti Community." These disclosures form the basis of this Action.

**Materially False and Misleading Statements Issued During the Class Period**

27.     The Class Period begins on September 28, 2012, when Ubiquiti filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended June 30, 2012 (the "2012 10-K"). In the  2012 10-K, the Company disclosed an accounts receivable balance as of June 30, 2012 of $75.6 million:

|  | June 30, | |
|---|---|---|
|  | 2012 | 2011 |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $122,060 | $76,361 |
| Accounts receivable, net of allowance for doubtful accounts of $1,266 and $596, respectively | 75,644 | 39,811 |
| Inventories | 7,734 | 5,663 |
| Current deferred tax asset | 882 | — |
| Prepaid expenses and other current assets | 1,577 | 6,267 |
|  | | |
| Total current assets | 207,897 | 128,102 |
| Property and equipment, net | 4,471 | 1,022 |
| Long-term deferred tax asset | 232 | 324 |
| Other long–term assets | 1,136 | 2,230 |
|  | | |
| Total assets | $213,736 | $131,678 |

28.     The 2012 10-K also identified customers with receivables over 10 percent of its total outstanding receivables. In particular, Ubiquiti reported that a company called "Discomp" accounted for 12 percent of its reported $75.6 million in receivables, meaning that Discomp's share of the receivable was $9.072 million. The 2012 10-K identified such customers on the chart reproduced below:

| | Percentage of Revenues Years Ended June 30, | | | Percentage of Accounts Receivable June 30, | |
|---|---|---|---|---|---|
| | 2012 | 2011 | 2010 | 2012 | 2011 |
| Flytec Computers Inc. | 16% | 20% | 17% | 19% | 21% |
| Streakwave Wireless Inc. | 10% | 15% | 13% | 11% | 25% |
| Discomp | * | * | * | 12% | * |
| * denotes less than 10% | | | | | |

29.     The 2012 10-K contained signed certifications pursuant to Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Pera and Ritchie, stating that the financial information contained in the 2012 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

7

30.     According to its web site, www.discomp.eu, Discomp is a vendor of computer networking equipment in the Czech Republic.

31.     According to another prominent market research analyst, Discomp only reported a total "trade payable" of approximately $3.43 million as of June 30, 2012 to the Czech Republic's Public Registry and Collection of Documents within the Ministry of Justice.

32.     It is simply impossible to square the $9.072 million receivable that Ubiquiti reported, with the total $3.43 million that Discomp reported.

33.     Moreover, the large discrepancy between Ubiquiti's report of the Discomp receivable, and Discomp's report of its own "trade payable" was not an isolated occurrence.

34.     On August 21, 2015, Ubiquiti filed its Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended June 30, 2015 (the "2015 10-K"), reporting, among other things, a total of $66.1 million in receivable as of that day:

| | June 30, | |
| | 2015 | 2014 |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $446,401 | $347,097 |
| Accounts receivable, net of allowance for doubtful accounts of $1,071 and $1,395, respectively | 66,104 | 54,871 |
| Inventories | 37,031 | 46,349 |
| Current deferred tax assets | 1,535 | 884 |
| Prepaid income taxes | 2,566 | 3,256 |
| Prepaid expenses and other current assets | 27,709 | 13,267 |
| Total current assets | 581,346 | 465,724 |
| Property and equipment, net | 15,602 | 7,260 |
| Long-term deferred tax assets | 1,515 | 1,255 |
| Other long–term assets | 2,109 | 1,912 |
| Total assets | $600,572 | $476,151 |

35.     Ubiquiti once again disclosed customers with receivables greater than 10 percent of the total. In the chart below, it disclosed that a customer called P.W. Batna Magdalena Mucha ("Batna") accounted for 12 percent of the receivables as of that date – meaning that Batna's share was $7.93 million.

| | Percentage of Revenues | | | Percentage of Accounts Receivable | |
| | Years Ended June 30, | | | June 30, | |
| | 2015 | 2014 | 2013 | 2015 | 2014 |
|---|---|---|---|---|---|
| Flytec Computers, Inc. | * | 13% | 13% | * | 13% |
| Streakwave Wireless, Inc. | * | * | * | 13% | 12% |
| P.W. Batna Magdalena Mucha | * | * | * | 12% | 12% |

*denotes less than 10%*

36.     The Company's 2015 10-K was signed by Defendants Pera and Spragg, the interim Chief Accounting Officer. The 2015 10-K contained signed certifications pursuant to SOX by Defendants Pera and Spragg, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

37.     On February 4, 2016, Ubiquiti filed its quarterly report on Form 10- Q with the SEC, announcing the Company's financial and operating results for the quarter ended December 31, 2015, disclosing, among other things, that it had accounts receivable of $64.6 million as of December 31, 2015 and it reiterated the $66.1 million receivable figure as of June 30, 2015 in a separate column:

| | | December 31, 2015 | June 30, 2015 |
|---|---|---|---|
| **Assets** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ | 496,672 | $ 446,401 |
| Accounts receivable, net of allowance for doubtful accounts of $1,244 and $1,071 at December 31, 2015 and June 30, 2015 respectively | | 64,568 | 66,104 |
| Inventories | | 33,105 | 37,031 |
| Vendor deposits | | 15,620 | 19,998 |
| Current deferred tax asset | | 1,535 | 1,535 |
| Prepaid income taxes | | — | 2,566 |
| Prepaid expenses and other current assets | | 8,440 | 7,711 |
| Total current assets | | 619,940 | 581,346 |
| Property and equipment, net | | 13,359 | 15,602 |
| Long-term deferred tax asset | | 1,538 | 1,515 |
| Other long-term assets | | 1,918 | 2,109 |
| Total assets | $ | 636,755 | $ 600,572 |

38.     In the Company's February 4, 2016 10-Q, Ubiquiti stopped reporting the names of customers with receivables greater than 10 percent of the total receivable. Instead, Ubiquiti employed pseudonyms. Specifically, Ubiquiti identified "Customer C" as accounting for 12 percent of the June 30, 2015 account receivable, or $7.9 million, and 14 percent of the December 31, 2015 receivable:

| | **Percentage of Revenues** | | | | **Percentage of Accounts Receivable** | |
|---|---|---|---|---|---|---|
| | **Three Months Ended December 31,** | | **Six Months Ended December 31,** | | **December 31,** | **June 30,** |
| | **2015** | **2014** | **2015** | **2014** | **2015** | **2015** |
| Customer A | 13% | 12% | 11% | 11% | * | * |
| Customer B | * | 13% | * | 11% | * | 13% |
| Customer C | * | * | * | * | 14% | 12% |
| Customer D | * | * | * | * | 15% | * |

* denotes less than 10%

39.     Ubiquity further reported in its February 4, 2016 Form 10-Q that the total accounts receivable as of December 31, 2015 were $64.6 million:

|  | | December 31, 2015 | June 30, 2015 |
|---|---|---|---|
| **Assets** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ | 496,672 | $ 446,401 |
| Accounts receivable, net of allowance for doubtful accounts of $1,244 and $1,071 at December 31, 2015 and June 30, 2015 respectively | | 64,568 | 66,104 |
| Inventories | | 33,105 | 37,031 |
| Vendor deposits | | 15,620 | 19,998 |
| Current deferred tax asset | | 1,535 | 1,535 |
| Prepaid income taxes | | — | 2,566 |
| Prepaid expenses and other current assets | | 8,440 | 7,711 |
| Total current assets | | 619,940 | 581,346 |
| Property and equipment, net | | 13,359 | 15,602 |
| Long-term deferred tax asset | | 1,538 | 1,515 |
| Other long-term assets | | 1,918 | 2,109 |
| Total assets | $ | 636,755 | $ 600,572 |

40.     That means that Batna's 14 percent of the $64.6 million receivable was $9.04 million.

41.     The Company's February 4, 2016 Form 10-K was signed by Defendants Pera and Spragg, the interim Chief Accounting Officer, and contained signed certifications pursuant to SOX by Defendants Pera and Spragg, stating that the financial information contained in the February 4, 2016 From 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

42.     The statements referenced in ¶¶ 27-41 were materially false and misleading because defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (i) the number of the Company's purported user community was drastically overstated; (ii) Ubiquiti had exaggerated its publicly reported accounts receivable; and (iii) as a result of the foregoing, Ubiquiti's publicly disseminated financial statements were materially false and misleading.

**Ubiquiti Has Inflated the Number of People in the "Ubiquiti Community"**

43.     According to its web site, https://www.anteny24.com/, Batna is headquartered in the Polish city of Czestochowa. It also sells computer networking equipment.

44.     According to Batna's audited financial statements, it had total "Trade Payables" of $2.746 million as of December 31, 2015. This figure is far at odds with the more than $9 million in receivables claimed by Ubiquiti in its Feb. 4, 2016 10-Q.

45.     It is, once again, simply impossible to square Ubiquiti's statements about its reported customers' outstanding receivables with the customers' own statements.

46.     The Citron Report also charged that Ubiquiti's repeated announcements that it has a user base; a/k/a "Ubiquiti Community," of 4 million people is false.

47.     Ubiquiti has made this assertion repeatedly. On February 9, 2017, Ubiquiti announced its second quarter 2017 financial results in a press release that stated that Ubiquiti's "growth is supported by the Ubiquiti Community, a global grass-roots community of 4 million entrepreneurial operators and systems integrators who engage in thousands of forums." The press release was filed that day as an exhibit to a form 8-K signed by Pera.

48.     This same statement was repeated on May 4, 2017, when Ubiquiti announced its third quarter 2017 financial results in a press release filed that day as an exhibit to the Company's Form 8-K filed with the SEC.

49.     On August 25, 2017 Ubiquity filed a form 10-K signed by Pera and Radigan which contained signed certifications pursuant to SOX by Defendants Pera and Radigan, stating that the financial information contained in the August 25, 2017 From 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting. That August 25, 2017 Form 10-K increased the size of the Ubiquiti community, describing it as "a

global, grass-roots community of over 4 million entrepreneurial operators and systems integrators who engage in thousands of on-line forums."

50.    Ubiquiti also disseminated an "investor presentation" on February 21, 2017 claiming that the "Ubiquiti Community" contained "4 million registered users." The presentation was an exhibit to a form 8-K filed that day, and signed by Pera.

51.    Ubiquiti repeated the claim on August 10, 2017 in another "investor presentation" filed as an exhibit to a form 8-K filed that day, and signed by Pera.

52.    A large Ubiquiti Community is significant for Ubiquiti because the Company lacks a traditional sales force, instead relying on its purported connection to this rabid user community to drive demand for its products.

53.    The Ubiquiti Community is central to Ubiquiti's strategy. For example, in the August 25, 2017 10-K, Ubiquiti said that its "business model is driven by a large, growing and highly engaged community of service providers, distributors, value added resellers, systems integrators and corporate IT professionals, which we refer to as the Ubiquiti Community. The Ubiquiti Community is a critical element of our business strategy as it enables us to drive: rapid customer and community driven product development … Scalable sales and marketing model … Self-sustaining product support."

54.    Essentially, Ubiquiti claims to have outsourced substantial elements of its product development, sales and marketing, and product support functions to its own customers – supposedly at substantial cost savings.

55.    In the Citron Report, Citron showed how each registered user was given a unique user ID, which appears in the URL (a/k/a web address) of their profile page. For example, a user

who registered in June 2017 received the user ID 643002, which tied to a web page at https://community.ubnt.com/t5/user/viewprofilepage/user-id/643002.

56.    The Citron Report showed that the user IDs are issued sequentially. A user ID registered in 2007 had user ID 94, and a profile page at https://community.ubnt.com/t5/user/viewprofilepage/user-id/94.

57.    The Citron Report showed that the user IDs ended at about 710,000 – far less than the 4,000,000 users reported. According to Citron, anyone searching for a profile on a user ID higher than 720,000 would see a message that "Person does not exist." (As of the date of this Complaint, the number has risen: now, User IDs higher than 730,000 generate a "Person does not exist" message.)

58.    Ubiquiti Community members can post in online message boards. Yet, Citron also reported that "97% of accounts never post. In an analysis of 11,250 recently registered accounts, 10,910 out of 11,250 (96.97%) never posted a single message on the forum. This is remarkable given that all the forum material is available without registering an account and the only apparent benefit to registering is the ability to post." Indeed, Citron asserted that "The majority of these 700,000 accounts are bots," e.g., "web robots."

59.    The exposure by Citron comes on the heels of Pera's sale of one million shares of Ubiquiti stock, for $61.25 apiece, on August 28, 2017, according to an SEC Form 4 dated August 30, 2017. Notably, that Form 4 filing does not specify that the sale occurred as part of any 10b5- 1 plan. Pera still owns 56.3 million of Ubiquiti's 80.4 million shares outstanding, according to the Form 4, providing a powerful incentive for him to take extreme measures to prop up the Company's stock price.

**The Truth Emerges**

60.     On September 18, 2017, Citron Research issued a report entitled "Citron Exposes Ubiquiti Networks," in which Citron detailed a series of "alarming red flags," indicating that the Company has been deceiving investors and is engaged in "corporate fraud," including, among other things, that the Company has misrepresented the size of its purported "Ubiquiti Community", as well as its levels of accounts receivable, among other things.

61.     On this news, Ubiquiti's share price fell nearly 8% to close at $50.62 on September 18, 2017.

62.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

63.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Ubiquiti securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

64.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Ubiquiti securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class

may be identified from records maintained by Ubiquiti or its transfer agent and may be notified

of the pendency of this action by mail, using the form of notice similar to that customarily used

in securities class actions.

65.     Plaintiff's claims are typical of the claims of the members of the Class as all

members of the Class are similarly affected by defendants' wrongful conduct in violation of

federal law that is complained of herein.

66.     Plaintiff will fairly and adequately protect the interests of the members of the

Class and has retained counsel competent and experienced in class and securities litigation.

Plaintiff has no interests antagonistic to or in conflict with those of the Class.

67.     Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class.  Among the

questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Ubiquiti;

- whether the Individual Defendants caused Ubiquiti to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Ubiquiti securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

68.     A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

69.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Ubiquiti  securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Ubiquiti securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

70.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

71.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

### **COUNT I**

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

72.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

73.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

74.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Ubiquiti securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Ubiquiti securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

75.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Ubiquiti securities.  Such reports, filings, releases and statements were

materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Ubiquiti's finances and business prospects.

76.     By virtue of their positions at Ubiquiti , defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

77.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of Ubiquiti, the Individual Defendants had knowledge of the details of Ubiquiti's internal affairs.

78.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Ubiquiti.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Ubiquiti's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Ubiquiti securities was artificially inflated throughout the Class Period.  In

ignorance of the adverse facts concerning Ubiquiti's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Ubiquiti securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

79.     During the Class Period, Ubiquiti securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Ubiquiti securities at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Ubiquiti securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Ubiquiti securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

80.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

81.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure

that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

82.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

83.     During the Class Period, the Individual Defendants participated in the operation and management of Ubiquiti, and conducted and participated, directly and indirectly, in the conduct of Ubiquiti's business affairs.  Because of their senior positions, they knew the adverse non-public information about Ubiquiti's misstatement of income and expenses and false financial statements.

84.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Ubiquiti's financial condition and results of operations, and to correct promptly any public statements issued by Ubiquiti which had become materially false or misleading.

85.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Ubiquiti disseminated in the marketplace during the Class Period concerning Ubiquiti's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Ubiquiti to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Ubiquiti within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they

participated in the unlawful conduct alleged which artificially inflated the market price of Ubiquiti securities.

86.     Each of the Individual Defendants, therefore, acted as a controlling person of Ubiquiti.  By reason of their senior management positions and/or being directors of Ubiquiti, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Ubiquiti to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Ubiquiti and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

87.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Ubiquiti.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  October 2, 2017

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
          ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*